UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL JOSEPH BOTT,

      Plaintiff,    Civil Action No. 16-10922
              Honorable Gershwin A. Drain
              Magistrate Judge David R. Grand
v.

CAROLYN W. COLVIN,
*acting Commissioner of Social Security,*

      Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [15, 16]**

   Plaintiff Daniel Joseph Bott ("Bott") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [15, 16], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.  RECOMMENDATION**

   For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Bott is not disabled under the Act. Accordingly, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [16] be GRANTED, Bott's Motion for Summary Judgment [15] be DENIED, and that pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision be AFFIRMED.

## II. REPORT

### A. Procedural History

On March 7, 2013, Bott filed an application for SSI, alleging a disability onset date of January 1, 2010. (Tr. 67, 127, 146). This application was denied at the initial level. (Tr. 79). Bott filed a timely request for an administrative hearing, which was held on December 16, 2014, before ALJ Mark Kim. (Tr. 38-66). Bott, who was represented by attorney Katherine Fortune, testified at the hearing, as did vocational expert ("VE") Donald Hecker. (*Id.*). On January 30, 2015, the ALJ issued a written decision finding that Bott is not disabled under the Act. (Tr. 22-36). On January 14, 2016, the Appeals Council denied review. (Tr. 1-5). Bott timely filed for judicial review of the final decision on March 14, 2016. (Doc. #1). On August 8, 2016, Bott filed a Motion for Summary Judgment. (Doc. #15). The Commissioner filed a Motion for Summary Judgment on September 2, 2016 (Doc. #16), and Bott filed a reply on September 22, 2016. (Doc. #17).

### B. Framework for Disability Determinations

Under the Act, SSI benefits are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or

mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

## C.     Background

### 1.     *Bott's Reports and Testimony*

At the time of the administrative hearing, Bott was 55 years old, and at 5'11'' tall, weighed 125 pounds. (Tr. 44, 46, 67, 146). He lived in a house with a roommate (the owner of the house). (Tr. 46, 155). He was not working. (Tr. 47). Bott completed twelfth grade and did not take any special education courses. (Tr. 46, 54, 147). Between 2010 and 2012, he worked three or four days a week as a bell ringer for the Salvation Army. (Tr. 46-47, 147, 180-83). This was a seasonal job that lasted approximately six weeks in November and December. (Tr. 46-47). He was required to stand while ringing the bell. (Tr. 48). A typical shift lasted five hours,

during which he would take five or six breaks to sit down – each between fifteen and twenty-five minutes long. (Tr. 53). Between 2010 and 2013, Bott also worked a number of very limited self-employed "odd jobs." (Tr. 147). Prior to 2010, he was incarcerated for seventeen years. (Tr. 153, 187). In his Function Report, he stated that he was unable to keep a job "due to the performance level required." (Tr. 155).

Bott alleges disability as a result of various physical and mental conditions, including vision problems, being "hard of hearing," being "mentally slow," chronic obstructive pulmonary disease ("COPD"), and back problems.[1] (Tr. 43, 48, 67, 146). He can see through his left eye, but if he focuses "too much" on it, he gets tired because he has weak eye muscles. (Tr. 48). His right eye needs surgery. (*Id.*). He often has ringing in both ears – which he said is a birth defect – that sometimes makes it hard to hear depending on the background frequencies. (Tr. 51-52). He doesn't use a hearing aid. (Tr. 161). Bott explained that "when things are perfectly quiet, [he] can understand a little bit better one-on-one." (Tr. 52). He gets short of breath after walking up fifteen to twenty stairs, but not down them. (Tr. 49-50). He said that walking up stairs is hard on his legs; after around nine or ten steps he starts to feel tension in them. (Tr. 50). His legs generally feel stiff and strained, but "the worst" is when he has to squat down and get back up because "it's very hard" and he feels a "head rush," dizzy, or lightheaded. (Tr. 50-51). His back tenses up in cold weather and depending on his movements, for example, whether he is sitting, standing, or lifting something "too heavy." (Tr. 49).

Bott indicated in his Function Report and in his Disability Report that he takes no medications. (Tr. 148, 162). But during the hearing, he testified that he takes medications, like muscle relaxers, for his back. (Tr. 49). He does not use a medically-prescribed walking aid.

---

[1] Bott does not challenge the ALJ's handling of his mental impairments, so the Court focuses its discussion on his arguments regarding his physical impairments.

(Tr. 161). He had surgery on his left eye, after which his vision improved; his vision was "cloudy," but he could see colors and things. (Tr. 53). He can read newspaper print and sometimes uses magnifiers. (Tr. 54). His vision impairment makes it hard to follow written instructions if they are in small print, but he can follow spoken instructions if they are short. (Tr. 160). He finishes what he starts and can handle minimal changes in routine. (Tr. 160-61).

Bott can lift close to ten pounds. (Tr. 52). He stays inside when it's cold and tries to go outside when it is warmer. (Tr. 158). He can go out alone, and he goes to the soup kitchen and to the park multiple times each week. (Tr. 158-59). He has no difficulty using public transportation. (Tr. 54, 158). Bott cannot drive because he does not have a driver's license (Tr. 48-49) and because he is "unable to see well enough." (Tr. 158).

Bott takes care of his personal needs and can prepare his own simple meals, though he also goes to soup kitchens "frequently." (Tr. 157). Once a week, he shops for groceries. (Tr. 158). He can count change and handle a savings/checking account. (*Id.*). Bott washes dishes, vacuums, mows the grass, rakes leaves, and shovels snow. (Tr. 157). On a typical day, he meditates, visits friends, cleans his house, fixes meals, listens to music, and watches television. (Tr. 156). He does not have a television, so he goes to places like bars to watch it. (Tr. 55). His hobbies include drawing and collecting antiques. (Tr. 52). He does not have problems with social interactions and gets along with authority figures "good." (Tr. 160-61). Three times a week, he talks to friends and watches sports with others. (Tr. 159). He claims his conditions have made him less outgoing and prevent him from playing sports. (Tr. 160).

 2. *Bott's Friend's Third-Party Function Report*

Bott's friend of over twenty years, Norman Curtiss, filled out a Third-Party Function Report on behalf of Bott on April 3, 2013. (Tr. 168-75). His report is mostly consistent with

Bott's in terms of his daily activities, though he states that Bott's conditions make him very slow at what he does and require him to take "to[o] many breaks."  (Tr. 168).

### 3.    Medical Evidence

The Court has thoroughly reviewed Bott's medical record.  In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

### 4.    Vocational Expert's Testimony

Donald Hecker testified as an independent VE at the administrative hearing.  (Tr. 55-65). The ALJ indicated that Bott did not have any past relevant work.  (Tr. 56).  He therefore proceeded to ask the VE to imagine a hypothetical individual of Bott's age, education, and work experience that could perform work at the full range of medium work, except that the work should be limited to occupations requiring no right-eye vision (only using the left eye), requiring no fine hearing capability, and where the person must avoid occasional exposure to extreme cold as well as hazards, such as moving machinery and unprotected heights.  (Tr. 56, 58).  In addition, the individual is limited to no commercial driving; simple, routine, repetitive tasks; work in a low-stress job, defined by only occasional changes in the work setting; and work involving only occasional interaction with the public and co-workers.  (Tr. 58-59).  The VE testified that the hypothetical individual would be capable of performing the following unskilled jobs:  machine feeder (17,000 jobs in Michigan, 510,000 jobs in the national economy); conveyor (18,000 jobs in Michigan, 540,000 jobs in the national economy); and packager (20,000 jobs in Michigan, 600,000 jobs in the national economy).  (Tr. 59-60).  The VE stated that this testimony is consistent with the Dictionary of Occupational Titles ("DOT").  (Tr. 60).  Moreover, the VE explained that where the individual would be using machinery, the moving parts would be

shielded. (Tr. 63-64). In the VE's opinion, this would make it safe for a claimant who is blind in one eye to work with machinery. (Tr. 63). The VE also clarified that the medium exertion level does not offer a sit/stand option and that if a person required a quiet work environment, none of these medium jobs would be an option. (Tr. 64).

The ALJ then asked the VE to imagine a hypothetical individual of Bott's age, education, and work experience that could perform a full range of light work, except that the work would involve occasional climbing of ramps or stairs, ladders, ropes or scaffolds; involve occasional stooping, crouching, and crawling; be limited to working with objects that are larger than a baseball; and be limited to occupations that do not require fine hearing capability. (Tr. 60). The work would also be limited to jobs that do not require complex written or verbal communication; would require avoidance of all exposure to extreme cold and even occasional exposure to excessive noise and hazards, such as moving machinery and unprotected heights. (Tr. 61). The work would involve no commercial driving; be limited to simple, routine, repetitive tasks; be in a low-stress job, which is defined as occasional changes in a work setting; and involve occasional interaction with the public and co-workers. (*Id.*). The VE testified that the individual could do the following light jobs: cleaner (8,000 jobs in Michigan, 240,000 jobs in the national economy); packer (8,500 jobs in Michigan, 240,000 jobs in the national economy); and clerical assistant (or clerk) (10,000 jobs in Michigan, 330,000 jobs in the national economy). (Tr. 61-62). The VE again stated that his testimony is consistent with the DOT. (Tr. 62).

Next, the ALJ asked the VE to imagine a hypothetical individual with the same limitations as in the previous example but with a slight variation: the individual needs to be allowed to sit and stand alternatively every thirty minutes, and the work must allow this person to be off task for twenty percent of the workday, in addition to regularly-scheduled breaks. (*Id.*).

The VE testified that this would be work preclusive.  (Tr. 63).

### D.     The ALJ's Findings

At Step One of the five-step sequential analysis, the ALJ found that Bott did not engage in substantial gainful activity since March 7, 2013 (his application date).  (Tr. 24).  At Step Two, the ALJ found that Bott has the severe impairments of COPD, right-eye blindness, cataracts, back disorder, tinnitus, and borderline intellectual functioning.  (*Id.*).  At Step Three, the ALJ found that Bott's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 24-27).

The ALJ then found that Bott retains the residual functional capacity ("RFC") to perform medium work, with the following additional limitations:  occupations using no right-eye vision; occupations that do not require fine hearing capability; only occasional exposure to extreme cold as well as hazards such as moving machinery and unprotected heights; performing no commercial driving; performing simple, routine, and repetitive tasks; working in a low-stress job, defined as only occasional changes in the work setting; and performing work involving only occasional interaction with the public and co-workers.  (Tr. 27-30).

At Step Four, the ALJ concluded that Bott has no past relevant work.  (Tr. 30).  At Step Five, the ALJ found that considering Bott's age, education, work experience, and RFC, he can perform the following jobs that exist in significant numbers in the national economy:  machine feeder (17,000 jobs in Michigan, 510,000 jobs in the national economy); conveyor off-bearer (18,000 jobs in Michigan, 540,000 jobs in the national economy); and packager (20,000 jobs in Michigan, 600,000 jobs in the national economy).  (Tr. 30-31).  As a result, the ALJ concluded that Bott is not disabled under the Act.  (Tr. 31).

### E.     Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ

or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'").

## F.    Analysis

In his motion for summary judgment, Bott argues that: (1) the RFC is flawed because the ALJ erred in failing to (a) express in functional terms the limitations caused by Bott's hearing impairments, (b) express in functional terms the limitations caused by Bott's vision impairments, and (c) develop a full and fair record related to these impairments; and (2) the ALJ's credibility determination is not supported by substantial evidence. These arguments are addressed below.

### 1.    *Substantial Evidence Supports the ALJ's RFC Determination*

#### a.  *Hearing Impairment*

Bott argues that the portion of the RFC limiting him to "occupations that do not require fine hearing capability" is unsupported by medical evidence in the record, including the evidence the ALJ cited in his decision. (Doc. #15 at 12-13; Tr. 27). Specifically, Bott takes issue with there being "no hearing testing or functional opinion" regarding his hearing capabilities in the

record.[2]  (Doc. #15 at 13).  He also argues that the ALJ should have considered whether a limitation on environmental noise was necessary.[3]  (*Id.*).  A review of the record, however, shows that the ALJ committed no error with respect to this issue.

In formulating the RFC, the ALJ appropriately relied on a variety of evidence in the record.  For example, he relied on the June 29, 2010 opinion of consultative examining physician Richard C. Gause, M.D., who found that although Bott had chronic tinnitus, he "could hear conversational speech without limitation or aids."  (Tr. 28, 242-44).  He also relied on the May 31, 2013 opinion of consulting examining physician Siddharth Shetgeri, M.D., who recorded that Bott has had "difficulty hearing" since he was an infant, due to congenital hearing loss from being born premature.  (Tr. 28, 256).  Dr. Shetgeri described Bott's hearing as "decreased moderately on both sides . . . with ringing in the ears."  (Tr. 257, 260).  In addition, the ALJ considered testimony by Bott and Curtiss that Bott's activities of daily living included watching television, listening to music, watching sports, and visiting friends, which involve some level of hearing.  (Tr. 29).

---

[2] At the outset, the Court notes this argument's inaccurate factual premise; a state agency medical consultant, Edward Brophy, D.O., analyzed Bott's functional capacity in assessing his RFC, and found Bott had no "communicative limitations."  (Tr. 73-76).

[3] Bott also argues that because the ALJ found his tinnitus to be "severe" at Step Two, he should have imposed a more significant RFC hearing limitation.  (Doc. #15 at 15).  This argument is flawed.  The Step Two severity determination is "a *de minimis* hurdle," requiring the claimant merely to show that a particular impairment more than minimally impacts her ability to perform work-related functions.  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  "A claimant's severe impairment may or may not affect his or her functional capacity to do work.  One does not necessarily establish the other."  *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007) (quoting *Yang v. Comm'r of Soc. Sec.*, No. 00-10446, 2004 WL 1765480, at *5 (E.D. Mich. July 14, 2004)).  "Put another way, the existence of a severe impairment says nothing as to its limiting effects."  *Simpson v. Comm'r of Soc. Sec.*, No. 1:13-cv-640, 2014 WL 3845951, at *9 (S.D. Ohio Aug. 5, 2014) (citing *Higgs*, 880 F.2d at 863); *see also Thomas v. Astrue*, No. 10-1777, 2011 WL 4496533, at *5 (N.D. Ohio Sept. 27, 2011) ("Given the very broad definition of what constitutes a severe impairment at Step Two, it is not *per se* inconsistent for a severe impairment to result in relatively minor work restrictions.").

Other evidence also supports the ALJ's RFC finding as to Bott's hearing. For instance, although Bott said he "used to have a hearing aid in high school" (Tr. 233), he apparently hasn't used one in decades. On August 2, 2011 and September 6, 2011, Bott's hearing was recorded as "normal." (Tr. 252-53). A Disability Report indicates that during a face-to-face interview on March 11, 2013, Bott had no difficulty with hearing, understanding, coherency, talking, and answering questions. (Tr. 143). In their June 2013 report, state examining consultants Robert Newhouse, M.D., and Edward Brophy, D.O., did not list Bott's hearing as a medically determinable impairment and found that he had no communicative limitations. (Tr. 71, 74). The ALJ gave "great weight" to these opinions. (Tr. 29). Bott was able to participate at the hearing before the ALJ, and testified that whether he has a hard time hearing things "all depends on the background frequencies." (Tr. 51-52). Finally, there is no indication in the record that Bott received any treatment for tinnitus. Again, there is ample support in the record for the ALJ limiting Bott to "occupations that do not require fine hearing capability." (Tr. 27).

Bott also argues that the ALJ erred in not mentioning the June 16, 2010 observations of psychologist consultative examiner Stuart Quirk, Ph.D., that "[Bott] was clearly hard of hearing and the interviewer had to speak quite loudly to be heard." (Doc. #15 at 14; Tr. 234). The ALJ's failure to mention this single sentence in the record does not constitute reversible error. First, the law is clear that an ALJ can consider an entire record without specifically mentioning each and every piece of the document in the file. *Kornecky*, 167 F. App'x at 508. Second, as noted above, the ALJ did reference other records evidencing that Bott experienced some degree of hearing difficulties. Third, Bott bears the burden of proof on this issue, and he has not shown that the RFC limitation imposed by the ALJ (which is supported by substantial evidence) is inadequate to address Dr. Quirk's finding.

Bott also argues that the ALJ should have included a limitation on environmental noise, stating, "[l]ogically, [his] difficulty hearing and tinnitus would be affected by work environments with loud background noise, particularly if that loud noise would detrimentally impact his ability to understand or communicate with others."  (Doc. #15 at 12).  He argues that his ability to hear conversational speech "does not prove he can work in a loud environment."  (*Id.* at 13).  But, again, Bott has the burden of proving his RFC, and he points to no evidence justifying the inclusion of an additional environmental restriction to accommodate his hearing impairment.[4] Indeed, Dr. Brophy opined that Bott had no environmental limitations.  (Tr. 74); *Preslar*, 14 F.3d at 1110; *Thiele v. Berryhill*, No. 1:16CV00942, 2017 WL 1207977, at *16 (N.D. Ohio Mar. 10, 2017); 20 C.F.R. § 416.912.

Moreover, while "[c]ommunication is an important factor in work," the Social Security Administration has established that "hearing impairments do not necessarily prevent communication, and differences in types of work may be compatible with various degrees of hearing loss."  SSR 85-15 (PPS-119), at *7 (1985).  For example,

> [o]ccupations involving loud noise, such as in printing, have traditionally attracted persons with hearing impairments, whereas individuals with normal hearing have to wear ear protectors to be able to tolerate the working conditions . . . . There are so many possible medical variables of hearing loss that consultation of vocational reference materials or the assistance of a [VE] is often necessary to decide the effect on the broad world of work.

*Id.*

---

[4] Even where a medical opinion did exist as to the plaintiff's environmental restrictions, the Sixth Circuit held that these did "not rise to the level of a nonexertional impairment" because "[w]here a person has a medical restriction to avoid excessive amounts of noise, dust, etc., the impact on the broad world of work would be minimal [since] most job environments do not involve great noise, amounts of dust, etc."  *Craft v. Sec'y of Health & Human Servs.*, No. 85-4042, 812 F.2d 1406, at *7 (6th Cir. Jan. 22, 1987) (quoting SSR 83-13 (Jan. 1983)).

In this case, the record indicates that Bott's hearing issues "do not necessarily prevent communication." *Id.* The ALJ appropriately consulted a VE during the hearing and explicitly asked him to consider Bott's hearing limitation. (Tr. 55-63). The VE then listed jobs that involve machinery, such as a machine feeder and conveyor off-bearer, finding them compatible with Bott's impairment, and Bott has failed to cite to cases, statues, or regulations showing otherwise. The ALJ's RFC limiting Bott to no fine hearing capabilities is thus supported by substantial evidence.

### b. Vision Impairment

Bott argues that the ALJ erred by formulating an RFC when there was "no interpretation or opinion from a medical source which translated [his] visual acuities and other findings [regarding his right-eye blindness] into actual functional effects." (Doc. #15 at 16). In his view, the ALJ's RFC limitation of "no right eye vision" failed to account for more specific and potentially disabling limitations, such as depth perception, near acuity, and far acuity. (*Id.* at 17). He argues that given this lack of evidence in the record, the ALJ improperly relied on "his own lay interpretation of medical testing." (*Id.* at 16). Bott also argues that the ALJ's "failure to express [his] vision impairment in functional terms" potentially creates "problematic, unexplained" inconsistencies between the VE's testimony and the DOT and the Selected Characteristics of Occupations ("SCO"). (*Id.* at 18). These arguments lack merit.

The ALJ's RFC limitation of "no right eye vision" is supported by substantial evidence. (Tr. 227, 233, 242-43, 246, 252, 256-57, 270-72). Multiple medical records between 2010 and 2014 document Bott's lack of vision in his right eye, so this limitation is not the product of the ALJ's "own lay interpretation." (*Id.*; Doc. #15 at 16). The other vision limitations are similarly well-supported.

In support of his argument that the ALJ improperly interpreted raw medical data, Bott cites to *Beveridge v. Commissioner of Social Security*, No. 14-14226, 2016 WL 1403527 (E.D. Mich. Mar. 10, 2016). But *Beveridge* is distinguishable. In *Beveridge*, the ALJ erred by creating an RFC that did not appear to have a medical underpinning. *Id.* at *12. The ALJ in that case did not adopt the treating physician's opinion and did "not indicate from what medical opinion she [drew] the physical limitations" she incorporated into the RFC – leaving the court "[un]able to discern how the ALJ formulated her RFC recommendations." *Id.* The court therefore concluded that the ALJ had impermissibly interpreted raw medical data into functional terms. *Id.*

In Bott's case, however, the ALJ's decision makes clear that in fashioning vision limitations in the RFC, he relied on the opinion of Dr. Brophy, medical records from June 2010, September 2010, and June 2013, and testimony by Bott and Curtiss about Bott's activities of daily living. (Tr. 28-29). The ALJ gave "great weight" to Dr. Brophy's opinion that translated Bott's right-eye blindness into functional limitations. (Tr. 29). In conducting a physical RFC assessment, Dr. Brophy noted that Bott had a complete loss of vision on the right, but "intact" visual fields on the left, and rated the following aspects of Bott's vision as "limited" on the right side: near acuity, far acuity, depth perception, accommodation, color vision, and field of vision. (Tr. 73-74). Dr. Brophy found that Bott did not retain the visual fields to avoid hazards in the workplace, should do no commercial driving, and should avoid production or work situations that could be dangerous without right-eye peripheral vision. (Tr. 74). In determining that Bott was not disabled, Dr. Brophy concluded that the "medical evidence does not show [that Bott's] loss of vision is severe enough to meet the blindness requirements for [SSI] payments." (Tr. 78).

The ALJ properly considered Dr. Brophy's opinion. (Tr. 29). He explicitly noted Dr. Brophy's findings about avoiding workplace hazards, commercial driving, and situations

requiring right-eye peripheral vision (*id.*), and incorporated them into the RFC.[5]  (Tr. 27).

Moreover, the hearing transcript indicates that the ALJ was aware of Bott's near acuity and far

acuity limitations.  (*See, e.g.*, Tr. 57) ("[O]nly requiring frequent far [acuity].  Basically I want

this individual to only [be limited to] no near vision on the right eye.").  The ALJ also cited other

medical records regarding Bott's vision, including a September 2010 examination by Majed J.

Sahouri, M.D., who found that Bott's left cornea, lens, and retina were all normal, but that he had

myopia and astigmatism in that eye, and another record from April 2014 which indicated that

Bott had successful left eye cataract surgery with lens insertion.  (Tr. 28, 246, 277-78).  And, the

ALJ cited Bott's activities of daily living – such as watching television/sports, doing housework,

preparing meals, doing yard work, using public transportation, shopping in stores, going to soup

kitchens, and visiting friends – which require at least some degree of vision.  (Tr. 29).

For all of the foregoing reasons, the ALJ did not impermissibly rely on his own lay

interpretation of the medical evidence, and substantial evidence in the record supports the vision

limitations contained in the RFC.[6]  (Tr. 58).

---

[5] "Social Security regulations recognize that opinions from non-examining state agency consultants may be entitled to significant weight, because these individuals are 'highly qualified' and are 'experts in Social Security disability evaluation.'"  *Rios v. Comm'r of Soc. Sec.*, No. 1:16-CV-171, 2016 WL 6310280, at *3 (W.D. Mich. Oct. 28, 2016) (internal quotations omitted).

[6] The Commissioner also persuasively argues that "even if the ALJ erred by not imposing further restrictions on [Bott's] vision, any error was, at most, harmless."  (Doc. #16 at 20).  Since the ALJ found Bott able to perform medium work, he necessarily found Bott could also perform light work.  20 C.F.R. § 416.967(c).  The ALJ's second hypothetical to the VE was with respect to a person of Bott's age and education, who was limited to less than the full range of light work; the VE found such person could perform work of a "cleaner," which does not require near or far acuity, depth perception, accommodation, color vision, or field of vision.  Dictionary of Occupational Titles § 323.687-014, 1991 WL 672783 (U.S. Dep't of Labor 1991).  The VE testified to a significant number of such jobs in the national and Michigan economies.  (Tr. 61). Bott did not challenge this argument in his reply brief.

Bott's argument that the ALJ's framing of his vision impairment created a possible inconsistency between the VE's testimony and the DOT and SCO fails. Bott does not present any cases where remand was ordered based on this kind of possibility, and the case law supports a finding that the ALJ's questioning to the VE was proper. An ALJ is entitled to rely upon the testimony of a VE in response to hypothetical questions to the extent those questions accurately portray the claimant's physical and mental impairments. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the ALJ's questioning is accurate, a VE's "testimony concerning the availability of suitable work may constitute substantial evidence." *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001). An ALJ need not list a claimant's medical conditions in his questioning; rather, he must present an assessment of what the claimant "can and cannot do." *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). Thus, there is no requirement that the ALJ frame his hypothetical using language consistent with the DOT and SCO, and Bott does not cite any law to the contrary. Indeed, "neither the ALJ nor the VE is required to follow the DOT." *Beinlich v. Comm'r of Soc. Sec.*, No. 08-4500, 2009 WL 2877930, at *4 (6th Cir. Sept. 9, 2009) (citing *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003)).

Moreover, the Sixth Circuit has held that "the ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00-4p," which merely requires that the ALJ ask the VE about any possible conflict between the VE's evidence and the DOT. *Id.*; SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000); *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605-06 (6th Cir. 2009); *Ledford v. Astrue*, No. 07-4234, 2008 WL 5351015, at *10 (6th Cir. Dec, 19, 2008) ("[N]othing in applicable Social Security regulations requires the [ALJ] to conduct his or her own investigation into the testimony of a [VE] to determine its accuracy, especially when the claimant fails to bring any conflict to the attention of the [ALJ]." (citing

*Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374-75 (6th Cir. 2006))). Instead, "[t]his obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT. The fact that plaintiff's counsel did not do so is not grounds for relief." *Beinlich*, 2009 WL 2877930, at *4 (citing *Ledford*, 2008 WL 5351015, at *10-11). Here, the ALJ specifically asked the VE if his testimony comported with the DOT, to which the VE responded in the affirmative. (Tr. 60). Because the ALJ's questioning accurately portrayed Bott's visual limitations[7] and Bott (and his attorney) did not take issue with the VE's testimony at the hearing, the ALJ was entitled to rely on the VE's testimony.

### c.  The ALJ's Duty to Adequately Develop the Record

Bott argues that the evidence on his hearing and vision impairments was "insufficient" for the ALJ to properly determine how it impacted his functioning, so "the ALJ erred in failing to develop the record on this matter." (Doc. #15 at 15, 17). Bott argues that the ALJ should have obtained a medical source opinion on his functional limitations. (*Id.*). The Court disagrees.

While the claimant bears the ultimate burden of establishing that she is entitled to disability benefits, courts have recognized that social security proceedings are "inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000); 20 C.F.R. § 416.912. As a result, an ALJ has an affirmative duty to develop the factual record upon which his decision rests, regardless of whether the claimant is represented by legal counsel at the administrative hearing. *See Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983)

---

[7] The ALJ's hypothetical included an individual limited to no right-eye vision, occasional exposure to hazards such as moving machinery and unprotected heights, and no commercial driving. (Tr. 58). These limitations are consistent with the record. *Smiley v. Comm'r of Soc. Sec.*, No. 10-CV-10473, 2010 WL 5462548, at *7 (E.D. Mich. Nov. 1, 2010) (finding that the ALJ's decision was supported by substantial evidence where the ALJ's hypothetical questions were "detailed and proper" and "accurately portrayed" the claimant's individual impairments in line with the medical evidence in the record).

(citing *Richardson v. Perales*, 402 U.S. 389, 410 (1971) (recognizing that the responsibility for ensuring that every claimant receives a full and fair hearing lies with the ALJ)); 20 C.F.R. § 416.912. At the same time, however, "[t]he ALJ 'does not act as counsel. He acts as an examiner charged with developing the facts.'" *Nealy v. Comm'r of Soc. Sec.*, No. 15-CV-10414, 2016 WL 922949, at *2 (E.D. Mich. Mar. 10, 2016) (quoting *Richardson*, 402 U.S. at 410).

Whether an ALJ has satisfied his "special, heightened duty" to develop the record is determined on a case-by-case basis. *See Osburn v. Apfel*, No. 98-1784, 1999 WL 503528, at *7 (6th Cir. July 9, 1999) (internal citation omitted). Although there is no bright line test to be applied, courts have recognized that "[f]ailure by an ALJ to fully develop the factual record in a particular matter is often evidenced by superficial or perfunctory questioning, as well as a failure to obtain all available medical records and documentation." *Vaca v. Comm'r of Soc. Sec.*, No. 1:08-cv-653, 2010 WL 821656, at * 6 (W.D. Mich. Mar. 4, 2010) (citing cases). Indeed, courts have explicitly stated: "An ALJ has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing." *Figard v. Comm'r of Soc. Sec.*, No. 1:09-cv-425, 2010 WL 3891211, at *7 (W.D. Mich. July 1, 2010) (quoting *Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996)). "In determining whether it is necessary to remand for a clarification of the record, the court is guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Nealy*, 2016 WL 922949, at *2 (internal quotation omitted).

Here, the ALJ did not ignore his obligation to further develop the record. The administrative hearing lasted close to two hours, during which the ALJ's questioning was appropriate. (Tr. 38-66). Bott did not inform the ALJ that medical documents were missing from his file or request the ALJ's assistance in reaching out to his medical providers to further

develop his medical history. *Nealy*, 2016 WL 922949, at *3 ("[N]o authority demand[s] that the ALJ continue a search for records without any other indication of where to look."); 20 C.F.R. § 416.912. Bott takes issue with there being no medical record that explicitly addresses his hearing and visual limitations in functional terms. But as explained above, Dr. Brophy did just that. And multiple consultative examining physicians opined on Bott's hearing and visual limitations, even though the ALJ is not required to obtain such examinations. (*See, e.g.*, Tr. 233, 242, 246, 250); *Nealy*, 2016 WL 922949, at *3; 20 C.F.R. § 416.912(b)(2). Bott fails to identify who else the ALJ should have contacted. Nor does he specify what kinds of tests should have been performed for the ALJ to better understand his impairments. Bott "has the ultimate burden of establishing the existence of a disability." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). Given these circumstances, the ALJ did not neglect a duty to develop the factual record.

### 2. Substantial Evidence Supports the ALJ's Credibility Determination

In his decision, the ALJ found that Bott's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible." (Tr. 28). Bott argues that this determination is not backed by substantial evidence "[b]ecause the ALJ failed to show how the evidence supported these reasons for diminishing Bott's credibility." (Doc. #15 at 21). Bott argues that the ALJ does not clearly explain how the medical evidence, Bott's treatment history, his work history, and his activities of daily living are contrary to his allegation of disability. The Court finds no error warranting remand.

The Sixth Circuit has held that determinations of credibility rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'" *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)). Thus,

an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith*, 307 F.3d at 379. The ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Rather, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record" to determine if the claimant's claims regarding the severity of her symptoms are credible. SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016); *see also* 20 C.F.R. § 416.929. In making an adjudication, a "single, conclusory statement" asserting consideration of the individual's symptoms or reciting the factors in the regulations is insufficient. SSR 16-3p, 2016 WL 1119029, at *10. Instead, "[t]he determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.*

The ALJ cited Bott's medical records to support his credibility determination. The ALJ reviewed records from August 2011 regarding Bott having a cough and COPD, and from May 2013 indicating that his lungs were clear to auscultation bilaterally without any adventitious sounds. (Tr. 27). He also reviewed eye examination results from June 2010, September 2010, and April 2014. (Tr. 28). He noted that Bott underwent a consultative examination in June 2010, where Bott had no difficulty getting on and off the examination table, heel and toe walking, squatting (and standing from a squat), and hopping. (*Id.*). The ALJ took into account

that Bott had impaired range of motion in his cervical and dorsolumbar spine but had full strength and was able to complete a straight leg raising test to 75 degrees on both sides. (*Id.*). The ALJ also mentioned that during a consultative examination in May 2013, Bott became unstable when getting up from the floor and walking in tandem heel to toe, but he walked with no assistive device, could squat to the floor, and could heel and toe walk without difficulty. (*Id.*). As discussed above, the ALJ thoroughly considered the opinions of state agency medical consultant Dr. Brophy regarding his hearing and vision impairments. (Tr. 28-29). The ALJ also reviewed Dr. Brophy's physical RFC assessment finding that Bott could lift, carry, push, and pull fifty pounds occasionally and twenty-five pounds frequently, and that Bott could stand, walk, or sit for six hours in an eight-hour workday. (Tr. 29).

Bott argues that the ALJ did not properly explain his conclusions that Bott's treatment had been relatively effective in controlling his symptoms and that, in general, Bott has not received the type of treatment one would expect for a totally disabled individual.[8] (Doc. #15 at 20; Tr. 28). But the ALJ properly considered Bott's treatment history, and his findings are supported by substantial evidence. *See* SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996) (requiring the ALJ to consider, in addition to the objective medical evidence, the claimant's treatment history, including treatment other than medication and its type, dosage, effectiveness, and side effects); 20 C.F.R. § 416.929(c)(3). The ALJ noted that in April 2014, Bott had a cataract extraction with lens insertion in his left eye and that in October 2014 his back pain was improving with Naproxen. (Tr. 28). A review of the record confirms that Bott's treatment was

---

[8] Bott also argues that the ALJ erred because he failed to indicate what treatment Bott "should have sought in order to make his allegations credible." (Doc. #15 at 20). The ALJ, however, is not required to do this under SSR 96-7p, 1996 WL 374186 (July 2, 1996), nor under 20 C.F.R. § 416.929. On March 28, 2016, SSR 96-7p, 1996 WL 374186 (July 2, 1996), was superseded by SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). Because SSR 96-7p was in effect on the date of the ALJ's January 30, 2015 decision, the Court will reference this earlier ruling in its analysis.

limited, yet effective. His left eye surgery was performed with no complications, and Bott was discharged in "apparent good condition." (Tr. 277-78, 299). Physicians noted that he was taking no medications, receiving no treatment, and did not need a walking aid. (Tr. 241-42, 250, 265, 271). In May 2013, Dr. Shetgeri opined that anti-inflammatory medications were controlling his symptoms. (Tr. 256). Between December 2013 and April 2014, his medications included Naproxen, Hydrochlorothiazide, and Ranitidine HCl. (Tr. 273-74, 268-69, 293, 296). Naproxen had helped him "a lot" in 2011 and was again improving his back pain in January 2014. (Tr. 267, 271). Thus, the ALJ's conclusion about the effectiveness of Bott's treatment is supported by substantial evidence.

As to Bott's argument about his limited treatment history, SSR 96-7p provides that it is appropriate for an ALJ to consider an individual's attempts to seek medical treatment – and the reasons, if any, why no treatment was sought – when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities or to function independently. SSR 96-7p, 1996 WL 374186, at *7; *Harris v. Comm'r of Soc. Sec.*, No. 14-14508, 2015 WL 12670524, at *11 (E.D. Mich. Oct. 7, 2015) (internal citations omitted) (finding that the ALJ "may consider the frequency and type of treatment a claimant seeks in determining the credibility of his alleged symptoms" because generally, when a claimant alleges pain so severe that it is disabling, it is reasonable to expect that the claimant will seek examination or treatment); *see Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004). A claimant's failure to seek treatment "may cast doubt on a claimant's assertions of disabling pain." *Strong*, 88 F. App'x at 846 (citing *Williams v. Bowen,* 790 F.2d 713, 715 (8th Cir. 1986); *Kimbrough v. Sec'y of Health & Human Servs.,* 801 F.2d 794, 797 (6th Cir. 1986)). But the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to

seek or pursue regular medical treatment without first considering any explanations *that the individual may provide, or other information in the case record*, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, 1996 WL 374186, at *7 (emphasis added). The applicable regulations provide that the ALJ may need to recontact the claimant or question him during the hearing, but this action is not a requirement.[9] *Id.* "While the ALJ [is] required to consider any explanations for plaintiff's failure to seek out medical treatment, [where] plaintiff has offered none for the ALJ to consider, [t]here is no basis to reverse the ALJ's decision." *Perrault v. Comm'r of Soc. Sec.*, No. 1:14-CV-942, 2015 WL 5592931, at *6-7 (W.D. Mich. Sept. 22, 2015). In this case, Bott provided no explanation as to why he did not seek regular medical treatment.[10] Accordingly, this claim of error does not provide grounds for remand.

Bott argues that the ALJ's analysis of his work history prior to the alleged disability onset date is not supported by substantial evidence because the ALJ overlooked that he was in prison for seventeen years. (Doc. #15 at 22). It is permissible for an ALJ to consider a claimant's work

---

[9] In arguing that the ALJ was required to ask about Bott's lack of regular medical treatment, Bott cites to SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016), which was not in effect on the date of the ALJ's decision. *See supra* note 8. To the extent that Bott raises a lack of medical insurance as a potential explanation (Doc. #15 at 20), the Sixth Circuit has held that "[t]he issue of poverty as legal justification for failure to obtain treatment does not arise unless a claimant is found to be under a disabling condition." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) (citing *McKnight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990)). Here, Bott was not found to be disabled, so the issue of him having no medical insurance did not arise.

[10] Moreover, the Sixth Circuit has backed the denial of benefits where a lack of medical treatment was not a "determinative" factor in the ALJ's credibility determination. *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) (affirming the district court's denial of the claimant's motion for summary judgment, in part, because "the ALJ's opinion does not suggest that he regarded Claimant's failure to seek medical examination or treatment as 'a determinative factor' in his credibility assessment"). Given that Bott's lack of medical treatment was only one factor in the ALJ's credibility determination (taking up only a few lines in a three-and-a-half-page, single-spaced analysis) (Tr. 28), the ALJ did not commit reversible error as to this issue.

history in assessing his credibility, *Perrault*, 2015 WL 5592931, at *6, and the ALJ's conclusion that Bott worked sporadically prior to the alleged disability onset date is supported by substantial evidence. (Tr. 28). Earnings records indicate that before Bott was incarcerated in 1993, he had no income in 1990 or 1991 and made only $1,904.39 in 1992. (Tr. 137-39). In addition, Bott stated in an undated Disability Report that he "tried to get a job by using MMI and Michigan Works, but [he] gave up on it too easily." (Tr. 153). He also mentioned that he has held a "couple of short term jobs," including working at a nursing home in the 1980s. (*Id.*). Thus, even excluding the time he was in prison, the ALJ had reason to conclude that Bott had a limited work history prior to his alleged disability onset date based on the evidence in the record.

Bott argues that his job with the Salvation Army after his alleged onset date is not inconsistent with his allegations of disability because of Bott's low earnings, the job's seasonal nature, and the job's low physical demands. But the ALJ merely considered this job in assessing Bott's daily activities, concluding that it indicates that his daily activities "have been somewhat greater than he has generally reported." (Tr. 29). Bott argues that his job does not support the ALJ's findings because his testimony that he has to take breaks to sit down suggests he needs a sit/stand option, which does not exist at the medium-work exertion level. (Doc. #15 at 23). He argues that this supports his allegations of disability, particularly because an RFC limiting him to light work would lead to a finding of him being disabled under the Medical-Vocational Rules. (*Id.*) (citing 20 C.F.R. Part 404, Subpart P, App. II, Table No. 2).

The ALJ's determination that Bott did not need a sit/stand option is supported by substantial evidence. Medical records from June 29, 2010 indicate that he could sit, stand, bend, stoop, carry, push, pull, squat (and arise from squatting), get on and off the examination table, climb stairs, and hop. (Tr. 240, 243). His reflexes were normal bilaterally, his gait was stable

and within normal limits, and he could heel-toe walk and tandem walk. (Tr. 241, 244). He did not need a walking aid and his strength scored a 5/5. (*Id.*). On August 2, 2011, his gait and station were normal, his extremities were symmetric, and there were no abnormal findings in his joints and range of motion. (Tr. 253). A face-to-face interviewer recorded that on March 11, 2013, Bott exhibited no difficulty sitting, standing, or walking. (Tr. 143). On May 31, 2013, Dr. Shetgeri wrote that he had full muscle strength, no atrophy, normal gait and station, no limp, and was able to walk without an assistive device. (Tr. 257-58, 260). Bott could heel-toe walk "without any problems." (Tr. 258, 260). In June 2010, Dr. Brophy opined that Bott could stand for a total of six hours in an eight-hour workday and sit for that same amount of time. (Tr. 73). On December 3, 2013, Bott's gait and station were normal and he had normal muscle strength. (Tr. 273). It was appropriate for the ALJ to weigh Bott's subjective statement that he could not remain standing during his entire shift as a bell ringer against these objective medical findings in evaluating his credibility. SSR 96-7, 1996 WL 374186, at *5.

In addition, the ALJ properly considered Bott's activities of daily living as they bear on his credibility. (Tr. 29). The ALJ noted that both Bott and Curtiss indicated that Bott's daily activities included meditating, watching television, listening to music, doing housework, maintaining personal hygiene, preparing meals, doing yard work, using public transportation, shopping in stores, watching sports, going to soup kitchens, and visiting friends. (*Id.*). Bott argues that the ALJ failed to explain how these activities are inconsistent "with his allegations that he is unable to work on a full-time, consistent basis." (Doc. #15 at 24). But the ALJ assessed these activities for a different purpose that is not only permissible but required: to evaluate Bott's credibility. (Tr. 29) ("The claimant has . . . described . . . daily activities that are not limited to the extent one would expect given his allegations of disabling symptoms."); SSR

96-7p, 1996 WL 374186, at *3 (requiring the ALJ to consider the claimant's daily activities in assessing the credibility of his statements); 20 C.F.R. § 416.929(c)(3)(i). Accordingly, the ALJ's evaluation of Bott's daily activities as they relate to his credibility was entirely proper.

In sum, when assessing Bott's credibility and the effects of his impairments, the ALJ fairly and properly considered the record evidence, including Bott's medical records, treatment history, work history, and activities of daily living. The Court finds no reason to disturb the ALJ's credibility determination because the ALJ observed Bott firsthand and his evaluation of the severity of Bott's symptoms and capabilities is supported by substantial evidence in the record.

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III.     CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [16] be GRANTED, Bott's Motion for Summary Judgment [15] be DENIED, and the ALJ's decision be AFFIRMED.


Dated: May 31, 2017                                    s/David R. Grand
Ann Arbor, Michigan                                DAVID R. GRAND
                                                            United States Magistrate Judge


## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any

further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 31, 2017.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager